United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 13, 2007**

Charles R. Fulbruge III
Clerk

*In the United States Court of Appeals
for the Fifth Circuit*

No. 05-30602

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

HOWARD DOUGLAS AUSTIN,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:03-CR-199-1

Before GARZA, PRADO and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

In this Medicare fraud case, the defendant pleaded guilty to violating 18 U.S.C. § 1347. He was sentenced to 27 months imprisonment and restitution of more than $2 million. The principal issues on appeal are (1) whether assets pledged after the offense was discovered should be credited in calculating the amount of loss; (2) the effect of payments made and assets pledged as a result of bankruptcy proceedings filed before discovery of the offense; and (3) whether $643,388 representing pension plan benefits that were funded before the loss was discovered should have been credited in determining the amount of loss.

We conclude that the district court properly construed and applied the Guidelines, except for the failure to credit $643,388 in calculating the loss. We accordingly vacate the order of restitution and remand for resentencing.

## I

Howard Douglas Austin and his wife owned and operated home health agencies (HHAs) in Lafayette and Baton Rouge, Louisiana. Through the HHAs, they provided services to Medicare beneficiaries. Medicare paid the HHAs' costs each year on an estimated basis, using historical and periodically updated data. At the end of each year, the HHAs reported their actual costs. If those costs exceeded the amount already paid, the HHAs would be reimbursed. But if the HHAs had been overpaid, they were required to reimburse Medicare. To qualify for reimbursement, the HHAs' expenses must have been paid in the year reported or during the following year.

Austin filed cost reports on behalf of the HHAs in 1997 and 1998 that included improper expenses and misrepresented actual costs. In 1997 a cost report included Austin's personal expenses of $1,963. The report also reflected employee bonuses of $322,910 which had not been paid, and pension plan benefits of $667,939 which had not been funded. However, pension plan benefits in the amount of $643,388 were funded within six to twelve weeks after the 1997 deadline for reimbursable expenditures had passed. In 1998 a cost report included Austin's personal expenses of $11,371. That report also reflected employee bonuses of $295,806 and pension plan benefits of $720,664 which were not paid or funded during the applicable reimbursement period.

2

Austin requested an extension to pay costs claimed on the 1998 report, but the request was denied. Shortly thereafter, the HHAs received a "Notice of Medicare Program Reimbursement," which stated that Medicare was seeking reimbursement of over $1.7 million. Medicare's notice was sent in January 2000. A few months later, in May 2000, Medicare discovered Austin's fraud.

In February 2000, before the fraud was discovered but after the reimbursement notice was received, Austin directed the HHAs to initiate Chapter 11 bankruptcy proceedings. The purpose of the bankruptcy proceedings was "to propose a plan to repay Medicare." Over a year later, to obtain approval of the reorganization plan, Austin offered to pledge personal assets of more than $2.8 million. His offer was accepted and the plan for reorganization was confirmed in July 2001. The plan included repaying Medicare 100% of all overpayments.

In 2004 Austin pleaded guilty to committing health-care fraud in violation of 18 U.S.C. § 1347. By May 2005, when Austin was sentenced, over $1.5 million had been repaid to Medicare through Medicare's withholding of cost reimbursements to the HHAs for services performed on an ongoing basis, and the balance due was secured by assets worth more than the amount owed. At sentencing, Austin asked the court to reduce his sentence based on the repayments and assets pledged. Austin argued that regardless of whether the court applied the 2004 Guidelines, which were in effect at sentencing, or the 1998 Guidelines, which were in effect when the offense occurred, the pledged assets and repayments reduce the amount of loss. Austin also argued that, under either version of the

3

Guidelines, the amount of loss and restitution are reduced by the $643,388 in pension plan benefits that were funded well before the offense was detected.

The district court rejected Austin's arguments, concluding that the pledged assets and repayments do not reduce the loss under either the 2004 or 1998 Guidelines. The district court determined the loss based on the improper and untimely costs reported, which totaled $2,020,653.60. Under the 2004 Guidelines, this loss calculation increased the offense level by 16 points.[1] But under the 1998 Guidelines, the offense level increased by only 12 points.[2] Therefore, the district court utilized the 1998 Guidelines and calculated an advisory sentencing range of 24 to 30 months based on a total offense level of 17. The district court sentenced Austin to 27 months imprisonment, restitution of $2,020,653.60 "with credit for any payments previously made," a fine of $50,000, and an assessment of $100. Austin appealed, raising the same arguments he made in the district court.

## II

Post-*Booker*,[3] we continue to review the district court's interpretation of the Sentencing Guidelines *de novo* and its fact findings for clear error, although the ultimate

---

[1]U.S SENTENCING GUIDELINES MANUAL § 2B1.1(b)(1)(I) (2004) (U.S.S.G) (increasing the offense level by 16 points for losses of more than $1,000,000 but less than $2,500,000).

[2]U.S.S.G. § 2F1.1(b)(1)(M) (1998) (increasing the offense level by 12 points for losses of more than $1,500,000 but less than $2,500,000).

[3]*United States v. Booker*, 543 U.S. 220 (2005).

4

sentence is reviewed for unreasonableness.[4]  When calculating a Guidelines sentencing range, a district court applies the Guidelines in effect at sentencing, unless the Guidelines in effect when the offense occurred would yield a lesser penalty.[5]  In such a case, to avoid ex post facto concerns, the court uses the Guidelines yielding the lesser penalty.[6]

At issue are the 2004 Guidelines, which were in effect at sentencing, and the 1998 Guidelines, which were in effect when the offense occurred.  Under both versions, the sentence for fraud is calculated by determining the amount of loss.[7]  Which yields the lesser sentence depends on how the loss is calculated under each.  Austin asserts that the loss amount of $2,020,653.60 was incorrectly calculated, and he raises various arguments and alternative contentions.  We consider each in turn.

### III

The issues before us focus primarily on note 8(b) in the commentary to section 2F1.1 of the 1998 Guidelines[8] and note 3(E) in the commentary to section 2B1.1 of the 2004 Guidelines.[9]  Austin contends that, unlike section 2F1.1 of the 1998 Guidelines, which the district court applied, section 2B1.1 of the 2004 Guidelines allow a credit for the value of

---

[4]*United States v. Duhon*, 440 F.3d 711, 714 (5th Cir. 2006), *petition for cert. filed*, __ U.S.L.W. __ (U.S. May 18, 2006) (No. 05-11144).

[5]*United States v. Harms*, 442 F.3d 367, 379 n.7 (5th Cir. 2006), *petition for cert. filed,* 75 U.S.L.W. 3398 (U.S. Jan. 12, 2007) (No. 06-990).

[6]*Id.*

[7]U.S.S.G. § 2B1.1(b)(1) (2004); U.S.S.G. § 2F1.1(b)(1) (1998).

[8]*Id*. § 2F1.1 cmt. n.8(b) (1998).

[9]*Id*. § 2B1.1 cmt. n.3(E) (2004).

5

collateral pledged without regard to the date the offense was discovered. If the assets Austin pledged in the bankruptcy proceedings were to be credited against the amounts the HHAs improperly reported ($2,020,653.60), the resulting loss would be zero.

The Guidelines themselves do not address whether or how collateral is to be applied, but the commentary provides specific loss-calculation rules, including rules regarding collateral. In construing and applying the commentary, we acknowledge that although the Guidelines are now advisory, the commentary's interpretation of the Guidelines generally remains authoritative.[10] When interpreting the commentary, we apply ordinary rules of statutory construction.[11]

The commentary to section 2F1.1 of the 1998 Guidelines provides that in fraudulent loan application and contract procurement cases, "the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan."[12] In 2001, the United States Sentencing Commission consolidated sections 2B1.1 and 2F1.1 into a single guideline, section 2B1.1.[13] The commentary to section 2B1.1 of the 2004 Guidelines regarding credits against loss, note 3(E), expressly references "the time the offense is

---

[10]*See Stinson v. United States*, 508 U.S. 36, 38 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

[11]*See United States v. Carbajal*, 290 F.3d 277, 283 (5th Cir. 2002) ("It is well established that our interpretation of the Sentencing Guidelines is subject to the ordinary rules of statutory construction.").

[12]U.S.S.G. § 2F1.1 cmt. n.8(b) (1998).

[13]U.S.S.G. app. C, amend. 617 (2001).

discovered" in subsection (i) but not subsection (ii), which addresses collateral. Austin pins

his argument on that omission and the references to "the time of sentencing":

> <u>Credits Against Loss</u>.—Loss shall be reduced by the following:
>
> (i)    The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim *before the offense was detected.* The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.
>
> (ii)   In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered *at the time of sentencing* from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral *at the time of sentencing.*[14]

"Loss," as used in the commentary to the 2004 Guidelines, is "the greater of actual

loss or intended loss."[15] Actual loss means "the reasonably foreseeable pecuniary harm that

resulted from the offense," while intended loss means "the pecuniary harm that was intended

to result from the offense . . . ."[16]

Because subsection (ii) of note 3(E) lacks an explicit time by which the collateral

must be provided, Austin contends that collateral provided any time before sentencing, even

on the eve thereof, reduces the loss. In other words, Austin asks us to interpret subsections

(i) and (ii) as follows: after the fraud has been discovered, a defendant cannot reduce the

---

[14]*Id.* § 2B1.1 cmt. n.3(E) (2004) (emphasis added).

[15]*Id.* § 2B1.1 cmt. n.3(A) (2004).

[16]*Id.* § 2B1.1 cmt. n.3(A)(i), (ii) (2004).

loss by actually transferring money or property to the victim;[17] however, the defendant can entirely eliminate the loss by merely pledging assets as collateral.[18] Ordinarily, we will not interpret a statute to achieve such arbitrary or absurd results,[19] and this case is no exception.

A defendant who has pledged or otherwise provided collateral in order to obtain funds "has never deprived [the victim] of more than the total amount of the [funds] less the value of the pledge . . . ."[20] The loss is reduced by pledged assets because those assets "[are] always available for recovery."[21] Applying this rationale, assets pledged up until the time the offense is discovered or the time the defendant reasonably should have known that the offense was detected or about to be detected, are referable to the context of the transaction because the pledge of assets is not an attempt to buy a sentence reduction or continue the fraud, but instead to effectuate a reduction of the actual or intended loss.

To construe subsection (ii) to allow the pledge of collateral after discovery of the offense would be totally at odds with the principles embodied in subsection (i) and would alter the long-standing, well-recognized rule that post-detection repayments or pledges of

---

[17]*See id.* § 2B1.1 cmt. n.3(E)(i).

[18]*See id.* § 2B1.1 cmt. n.3(E)(ii).

[19]*See United States v. Wilson*, 503 U.S. 329, 334 (1992) ("This interpretation of the statute would make the award of credit arbitrary, a result not to be presumed lightly.") (citing *United States v. Turkette*, 452 U.S. 576, 580 (1981) (noting that absurd results are to be avoided)).

[20]*United States v. Deavours*, 219 F.3d 400, 403 (5th Cir. 2000) (distinguishing a fraudulent borrower who has pledged collateral to secure a loan from a defendant in a Ponzi scheme who pays money to victims "not to compensate [them] for their losses, or to extricate themselves from wrongdoing, but conversely to extend their criminal activities and the profitability thereof").

[21]*Id.*

collateral do not reduce the loss.[22] Such payments and pledges are considered at sentencing, but with regard to restitution[23] and acceptance-of-responsibility reductions.[24]

The Guidelines use loss as a proxy for the seriousness of the fraud. An offense is generally less serious if the defendant "transfers something of value to the victim(s)."[25] But that "something of value" must be transferred before the fraud is detected. Otherwise, as the Sentencing Commission noted, "it would be inappropriate to credit the defendant" with the value of the transferred assets.[26] Other courts of appeals have recognized that the Guidelines

---

[22]*See infra* notes 23 and 24; *cf. United States v. Chichy*, 1 F.3d 1501, 1507-10 (6th Cir. 1993), *and United States v. Wright*, 60 F.3d 240, 242 (6th Cir. 1995), *as limited by United States v. Lucas*, 99 F.3d 1290, 1297-1300 (6th Cir. 1996).

[23]*See, e.g.*, *United States v. Cothran*, 302 F.3d 279, 288 (5th Cir. 2002) (debt repayment after detection was restitution and did not decrease the loss); *United States v. Scott*, 74 F.3d 107, 112 (6th Cir. 1996) (commission earned and offered after detection was restitution and did not reduce the loss); *United States v. Bell*, 974 F.2d 1332 (4th Cir. 1992) (unpublished) (collateral pledged after detection was equivalent to restitution and did not reduce the loss).

[24]*See, e.g.*, U.S.S.G. § 3E1.1 cmt. n.1(c) (2004) (listing "voluntary payment of restitution prior to adjudication of guilt" as an appropriate acceptance-of-responsibility consideration); *United States v. Abboud*, 438 F.3d 554, 594 (6th Cir. 2006) (post-detection repayments did not decrease the loss but indicated acceptance of responsibility), *cert. denied*, 127 S. Ct. 446 (2006); *United States v. Mau*, 45 F.3d 212, 216 (7th Cir. 1995) (same); *United States v. Akin*, 62 F.3d 700, 702 (5th Cir. 1995) (same).

[25]U.S.S.G. app. C, amend. 617, at 183 (2003).

[26]*Id.* ("The definition of 'time of detection' was adopted because there may be situations in which it is difficult to prove that the defendant knew the offense was detected even if it was already discovered. In addition, the words 'about to be detected' are included to cover those situations in which the offense is not yet detected, but the defendant knows it is about to be detected. In such a case, it would be inappropriate to credit the defendant with benefits transferred to the victim after that defendant's awareness.").

9

do not permit defendants to "buy a sentence reduction after being caught" or "to barter prison time in exchange for restitution."[27]

Austin is not entitled to a credit under subsection (ii). Austin did not pledge assets when he fraudulently obtained or retained the Medicare funds or to secure their repayment at any time before the offense was discovered. Austin's fraud did not become less serious because, more than a year after his fraud had been discovered, he pledged assets as part of his promise to repay. Austin did not "pledge or otherwise provide collateral" as that term is used in subsection (ii).

## IV

Austin next argues, in the alternative, that under the 2004 Guidelines, the repayments and assets pledged as a result of the Chapter 11 bankruptcy proceedings "relate back" to when the bankruptcy petitions were filed in February 2000. It is undisputed that Austin caused the HHAs to initiate bankruptcy proceedings "to propose a plan to repay Medicare." The HHAs' filings recognized Medicare as an uncontested creditor in the full amount of $1.7 million. When the plan for reorganization was eventually confirmed, it included repaying Medicare 100% of all overpayments. Austin claims the HHAs would have begun repaying Medicare before his fraud was discovered, but once bankruptcy proceedings were initiated, the HHAs could not make payments to creditors until a plan of reorganization was approved,

---

[27]*United States v. Pappert*, 112 F.3d 1073, 1079 (10th Cir. 1997); *see also, e.g.*, *United States v. Downs*, 123 F.3d 637, 643 (7th Cir. 1997) ("[W]e doubt that defendants should be allowed to buy reduced sentences by repaying the victims of their fraudulent schemes."); *Lucas*, 99 F.3d at 1299 ("[A] defendant cannot be permitted under the Guidelines to avoid an increase for amount of loss in a fraud scheme simply by being financially capable of repaying the money when discovered.").

and he contends statutory delays inherent in the bankruptcy proceeding "mak[e] Plan confirmation a lengthy process." According to Austin, his intent to repay was evident when the HHAs filed their bankruptcy petitions; therefore, the post-filing repayments and pledge of assets "relate back" to the filing date.

We are skeptical that the bankruptcy petition was filed before Austin's fraud was detected. Under the Guidelines commentary, an offense is detected when the victim or government discovers the fraud or when the defendant knew or reasonably should have known the offense was detected or about to be detected.[28] Here, the evidence suggests Austin knew his fraud was about to be detected. He caused the HHAs to initiate bankruptcy proceedings after Medicare denied an extension of time and after receiving a notice that Medicare sought $1.7 million in overpayments. However, the parties have stipulated that the offense was not detected until May of 2000, and we accept that stipulation. The HHAs initiated the bankruptcy proceedings before that date.

There are two components to Austin's claim for credit. The bankruptcy court confirmed a plan adopting a settlement agreement among the HHAs, the government, and the Austins under which the HHAs agreed to repay Medicare through "withholds" from amounts Medicare owed each month and the Austins pledged personal property with equity in excess of $2.8 million to secure repayment to the United States.

With regard to the assets the Austins personally pledged, Austin fails to explain why he did not repay or arrange to pledge assets to satisfy the amounts owed to Medicare in lieu

---

[28]*See* U.S.S.G. § 2B1.1 cmt. n.3(E)(i) (2004).

11

of causing the HHAs to file for bankruptcy. Nor does he provide an explanation for waiting to pledge his own assets to satisfy or reduce the amount the HHAs owed until more than a year after the fraud was detected.

As to the amounts repaid by "withholds" from Medicare, Austin essentially asserts that if a defendant voluntarily files for bankruptcy, admits the debt, and begins negotiating the terms of repayment before his fraud is detected, money eventually repaid reduces the loss. Austin argues this is in the victim's best interest because it encourages repayment. Even assuming this is true, the commentary's plain language forecloses allowing credit based on such facts. Subsection (i) of note 3(E) to the commentary applies to the repayments, and under that subsection, loss is reduced by "money *returned*," "property *returned*," and "services *rendered*" before the offense is detected.[29] A good faith intent to repay is not included. The commentary draws a distinction between repayment, which reduces loss, and restitution, which does not.

Repayments before detection show a relatively "untainted intent to reduce any loss. Repayments after detection may show no more than an effort to reduce accountability."[30] If a defendant promises repayment before detection but does not return assets until after detection, the repayment may well reflect an increased effort to reduce accountability. The later repayment may also reflect the defendant's previous inability to make repayments, either because his assets were insufficient or inaccessible. Or it may indicate that some other

---

[29]*Id.* (emphasis added).

[30]*United States v. Stoddard*, 150 F.3d 1140, 1146 (9th Cir. 1998).

circumstance, such as an increased risk of losing one's livelihood, arose after detection and

motivated great personal sacrifice to repay the debt. Regardless of the reason a defendant

cannot or does not make repayments before detection, the Guidelines require more than a

good-faith intent and promise to do so.

# V

The district court properly concluded that under the 2004 Guidelines, the post-

detection repayments and pledge of assets do not reduce the loss. Therefore, the offense

level under the 2004 Guidelines is higher than under the 1998 Guidelines, and the 1998

Guidelines apply. Austin contends that under the 1998 Guidelines, this is a fraudulent loan

application case within the meaning of the commentary to section 2F1.1, and that he should

receive credit for Medicare "withhold" payments and the assets he personally pledged.

The commentary to § 2F1.1 provides:

> In fraudulent loan application cases and contract procurement cases, the loss
> is the actual loss to the victim (or if the loss has not yet come about, the
> expected loss). For example, if a defendant fraudulently obtains a loan by
> misrepresenting the value of his assets, the loss is the amount of the loan not
> repaid at the time the offense is discovered, reduced by the amount the lending
> institution has recovered (or can expect to recover) from any assets pledged to
> secure the loan. However, where the intended loss is greater than the actual
> loss, the intended loss is to be used.[31]

Assuming without deciding that this case involves a "fraudulent loan application," the

question is whether the post-detection Medicare withholdings and pledge of assets relate

back to the date of the bankruptcy under the 1998 Guidelines. We conclude they do not.

---

[31]U.S.S.G. § 2F1.1 cmt. n.8(b) (1998).

Unlike the 2004 Guidelines, the 1998 Guidelines do not expressly require pre-detection "return" of assets or property.[32]  However, the 1998 and other pre-2001 Guidelines have been interpreted to carry forward the historical application of the time-of-detection rule developed in the case law.[33]  Post-detection returned assets and pledged collateral do not reduce the loss.[34]  The line between restitution and creditable, loss-reducing repayments can be difficult to draw.  But for the same reason that the withholdings from Medicare and the pledge of assets do not relate back under the 2004 Guidelines, they do not relate back under the 1998 Guidelines.  The initiation of bankruptcy proceedings was not an "untainted intent to reduce any loss."[35]

Austin argues that his companies could have filed Chapter 7 bankruptcy proceedings to avoid repaying the government and that it is undisputed that Chapter 11 proceedings were initiated before the offense was detected solely to formulate a plan under which the government would be repaid.  This, he contends, demonstrates the intent to repay pre-

---

[32]*See* U.S.S.G. § 2B1.1 cmt. n.3(E)(i) (2004) ("Loss shall be reduced by the following: (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.").

[33]*See, e.g.*, *United States v. Waldroop*, 431 F.3d 736, 744 (10th Cir. 2005) (applying the date-of-detection rule to the 1998 Guidelines); *United States v. Cacho-Bonilla*, 404 F.3d 84, 92 (1st Cir.) (applying the date-of-detection rule to the 1997 Guidelines), *cert. denied*, 126 S. Ct. 471 (2005); *United States v. Cothran*, 302 F.3d 279, 288 (5th Cir. 2002) (applying the date-of-detection rule to the 2000 Guidelines).

[34]*See supra* note 23.

[35]*See Stoddard*, 150 F.3d at 1146 ("Repayments before detection show an untainted intent to reduce any loss. Repayments after detection may show no more than an effort to reduce accountability.").

detection and should cause the repayments made by his companies to relate back to the date bankruptcy proceedings were initiated. The district court was free to take these facts, and others, into account in deciding the sentence it imposed. But they do not affect the calculation of the loss or the sentencing range under the guidelines.

## VI

The district court found the loss to be $2,020,653.60. Austin contends that the court erred in failing to give credit for $643,388 of pension plan benefits the HHAs actually funded in August and October of 1998. The probation officer conceded that this amount should be credited against the loss, but that was not done. The failure to recognize this credit during the sentencing proceedings resulted in a total offense level of 17 rather than 16 and restitution in the amount of $2,020,653.60 rather than $1,377,265.6. The $643,388 was funded long before Austin's fraud was detected, and the government concedes that these pre-detection payments would have reduced the loss if Austin had timely objected to the miscalculation. We conclude that even if the error was not preserved, reversal is required.

If a sentencing calculation error is not preserved, we review the calculation for plain error.[36] Under the plain error standard, there must be error that is plain and affects substantial rights.[37] If these conditions are met, "an appellate court may then exercise its

---

[36]*United States v. Alvarado-Santilano*, 434 F.3d 794, 795 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1812 (2006).

[37]*Johnson v. United States*, 520 U.S. 461, 467 (1997).

15

discretion to notice a forfeited error only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."[38]

In this case the error is plain, and it affects substantial rights. But for the loss miscalculation, Austin would have received a lesser sentence. Even assuming the term of imprisonment would have been the same, as the government suggests, the amount of restitution would have been less. The amount of restitution ordered under 18 U.S.C. § 3663 cannot be greater than the loss caused by the conduct underlying the offense of conviction.[39] When a defendant is ordered to pay restitution in an amount greater than the loss caused, the error affects substantial rights as well as the fairness and integrity of the judicial proceeding.[40] Although the sentence orders Austin to pay "$2,020,653.60 less any payments", the "less any payments" is ambiguous and does not cure the error in ordering restitution in an initial amount that is greater than the loss. Indeed, in spite of the government's concession that this amount should have been reduced by $643,388 for sentencing purposes, the government asserts that any credit that Austin may be due can be determined at a later time during a hearing to determine whether Austin has complied. We

---

[38]*Id.* (internal quotations omitted).

[39]*See United States v. Hickman*, 331 F.3d 439, 448 (5th Cir. 2003) (quoting *Hughey v. United States*, 495 U.S. 411, 420 (1990)).

[40]*See, e.g.*, *United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005) (concluding that the plain error test was met when the restitution order exceeded the loss caused by conduct underlying the offense of conviction); *Hickman*, 331 F.3d at 448 (same).

will not endorse such a process. The order of restitution is vacated, and we remand for resentencing.[41]

* * * * * *

For the reasons considered above, the defendant's sentence is AFFIRMED in part, the order of restitution is VACATED, and the case is REMANDED for resentencing with regard to restitution.

---

[41]*See Hickman*, 331 F.3d at 448.