UNITED STATES of America,
Plaintiff–Appellee,

v.

Vance K. WOLFE, Defendant–Appellant.

No. 95–3373.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 16, 1995.

Decided Dec. 15, 1995.

Dana M. Peters (argued and briefed), Office of U.S. Atty., Columbus, OH, for plaintiff-appellee.

Thomas M. Tyack (argued and briefed), Tyack & Blackmore, Columbus, OH, for defendant-appellant.

Before: BROWN, BOGGS, and NORRIS, Circuit Judges.

BOGGS, Circuit Judge.

Vance Wolfe appeals from his sentencing after pleading guilty to three counts of wire fraud, in violation of 18 U.S.C. § 1343, based on a Ponzi scheme he developed. We affirm.

## I

Wolfe's story begins in 1989, when he was working as a manager of Show Bizz Pizza in Oak Lawn, Illinois. At that time, Wolfe founded National Liquidators, Inc. (NLC), with the help of investment funds provided by Oak Lawn police officer Larry Ryan. NLC was in the business of purchasing "distressed" merchandise, i.e., either inventory overruns, or slightly damaged goods, and then reselling this merchandise to other retailers at a profit. NLC, which is now in bankruptcy, eventually became successful enough to spawn three subsidiaries.

During the period of NLC's success, it was not uncommon for the operation to earn 50% profit margins. Ryan, whose brother John was a CPA, helped to obtain working capital for NLC to use for the purchase of distressed merchandise. Early investors were very happy with the returns they were obtaining from Wolfe's NLC. Some even "rolled over" their gains into subsequent liquidation deals. Wolfe represented to each

investor that the investor was investing in a particular liquidation transaction. Wolfe, Ryan, and others communicated about investment deals by making interstate telephone calls, and by using the U.S. mails. Often investment funds were wired from Illinois banks to Ohio banks.

Sometime after the initial boom in its business, however, NLC and Wolfe began to experience difficulties in locating transactions that would allow investors to receive the returns promised. Rather than telling Ryan or the other investors about these problems, Wolfe kept this information to himself, and began using money from the recruitment of new investors to pay off earlier investors, converting NLC into what Wolfe's defense counsel characterized at oral argument as an enterprise with "a strong Ponzi component."

Eventually, the Ryan brothers became suspicious and went to talk to Wolfe about what was being done with investor money he received between May 1993 and October 1993. They could not reach Wolfe—Wolfe claimed he was hiding out in Cincinnati from other Chicago investors who had threatened his life. John Ryan, the CPA, discovered in an informal audit that Wolfe had used money from the relevant period to purchase a $284,000 home in Galena, Ohio, a Mercedes–Benz, a Chevrolet Corvette, and a large boat, and had funneled investor funds to NLC's subsidiaries to meet operating expenses, despite assurances by Wolfe that investment funds tied to specific NLC liquidation deals would be kept separate from Wolfe's other businesses. The Ryans then contacted the FBI in Columbus, and the FBI launched an investigation into NLC and Wolfe.

Once the FBI located Wolfe, he cooperated with both the Bureau and the United States Attorney. He admitted his wrongdoing, but maintained throughout that he wanted to pay all investors back, and never intended to defraud anyone—he simply became caught up in a "snowball effect." On August 31, 1994, the government filed a criminal information against Wolfe on three counts of wire fraud, in violation of 18 U.S.C. § 1343. The criminal information charged Wolfe with receiving approximately $7.1 million in new investment funds for NLC liquidation deals during the period May 1993 to September 1993, and paying out from 90% to 95% of these funds to previous investors. Wolfe tendered a negotiated guilty plea to these charges to the district court on September 16, 1994.

Wolfe's presentence report (PSR) was filed on January 19, 1995. It recommended granting Wolfe a three-level downward adjustment for acceptance of responsibility. It computed the amount of loss inflicted on the victims of Wolfe's NLC Ponzi scheme as $4,197,990. This is the amount of principal owed to at least 460 of NLC's first-time investors at the time the PSR was filed. The calculation yielded a 13–level increase in the base offense level because it fell into the category of a loss greater than $2,500,000, but less than $5,000,000. *See* USSG § 2F1.1(b)(1)(N). Wolfe objected before sentencing to the proposed 13–level enhancement, partly on the basis that he received only $360,000 in salary from NLC over the period.

Two days before sentencing, on March 8, 1994, the district judge phoned Wolfe's defense counsel to tell Wolfe he was thinking about denying Wolfe the adjustment for acceptance of responsibility. At sentencing on March 10, 1995, the district court disallowed the adjustment for acceptance of responsibility, and applied the 13–level amount of loss adjustment.

The district court explained that Wolfe had attempted to minimize his responsibility by maintaining that 11 of the 460+ first-time investors were merely rolling over their investments. The district court found Wolfe's statements in relation to the controverted first-time status of these investors to be untrue. The district court seemed most disturbed, however, by Wolfe's indication in a "personal statement" accompanying his counsel's objections to the PSR that his "investment program" allowed investors to become first-time homebuyers, pay off their mortgages, catch up on or pay off their bills, save their marriages, avoid bankruptcy, take vacations, fix their cars, start their own businesses, and retire. Wolfe is also the drummer in a country and western band. In his personal statement, he indicated that he hopes to provide restitution to the victims of

his Ponzi scheme if the band obtains a recording contract with a major record label. The district court found that Wolfe's assertion that many of the victims of his Ponzi scheme were unhappy simply because they misunderstood his intentions or the nature of the "investment program" showed that Wolfe lacked remorse. The court then allowed the defendant and his counsel to speak to the issue of Wolfe's acceptance of responsibility.

Defense counsel noted that the government was willing to stipulate that 8 of the 460+ investors originally referred to in the plea agreement were indeed rolling over their money. However, defense counsel also indicated that "some other [first-time investors]" were found, bringing the total loss to first-time investors up to $4,216,490. Defense counsel urged the district court to follow authority from other courts of appeals which he maintained held that the amount of gain to the defendant was what was relevant for sentencing purposes, not the amount of loss to the victim. The court refused to accept either of defense counsel's objections to the sentencing. Wolfe himself declined to say anything relevant to sentencing when specifically invited to do so by the district court.

Wolfe raises three issues in this appeal related to his sentencing: (1) the district court denied him and his counsel their rights to allocution, violating Fed.R.Crim.P. 32(c)(3)(B) & (C); (2) the district court erred in denying a reduction in sentencing for acceptance of responsibility under USSG § 3E1.1; and (3) the district court erred when it adopted a 13–level increase based on the loss caused by Wolfe's Ponzi scheme, even though Wolfe argued that 90–95% of the loss will be recovered by the bankruptcy trustee. We find all of Wolfe's challenges lacking in merit.

## II. RIGHT OF ALLOCUTION

■ The Sixth Circuit has not adopted a standard of review for allegations of a denial of the right of allocution. We are persuaded by *United States v. Taylor*, 11 F.3d 149, 151 (11th Cir.1994), that a *de novo* standard of review should be applied for two reasons. First, a defendant would probably not raise an allocution issue at sentencing before the district court, because if he did the district court is likely simply to offer the defendant and his counsel the opportunity to allocute or re-allocute. Second, because the right of the defendant and his counsel to allocute at sentencing is given in Fed.R.Crim.P. 32, when the defendant alleges he was denied this right he will usually be arguing that his sentencing procedures were deficient as a matter of law. *See United States v. Sparrow*, 673 F.2d 862, 863–64 (5th Cir.1982) (allegation that right of allocution was denied went to the judicial process by which sentence was imposed, and for this reason should be "carefully scrutinize[d]").

Wolfe argues that his right to allocution was denied because his counsel was given the opportunity to speak only after the district court indicated how it intended to rule on the defense's two objections to the PSR. As to Wolfe's objection relating to the calculation of amount of loss, the district court stated, "the Court overrules the objection because it finds by a preponderance of the evidence that the property loss under the guidelines was at least $2,500,000, as a result the 13 level increase was proper." As to Wolfe's objection relating to denial of the acceptance of responsibility adjustment, the district court stated, "the Court believes the defendant has not fully accepted responsibility for his crime." Only after making these pronouncements did the district court say to Wolfe's counsel, "In spite of that, Mr. Tyack, you may speak for the defendant at this time if you wish." (Wolfe was later given the opportunity to speak for himself, but declined to do so.) Wolfe argues that the chronology set forth above establishes that the district court prejudged his case, denying him his right to allocution, and side-stepped the proper procedures for dealing with controverted issues at sentencing in violation of Fed.R.Crim.P. 32(c)(1).

■ As an initial matter, it is important to note that neither the right to allocution in Fed.R.Crim.P. 32(c)(3)(B) & (C), nor the procedures for dealing with controverted matters in Fed.R.Crim.P. 32(c)(1) indicate that a judge may not state his ruling on the objections raised to the PSR, or to other sentenc-

ing matters, before the defendant or his counsel is given a chance to speak. None of the relevant rules adopt the chronological requirement Wolfe urges upon this Court. It will normally be preferable for a district court to allow the defendant and his counsel to speak before ruling on the objections and passing sentence, and we urge the district courts to adopt this sequence, especially for the purposes of satisfying Fed.R.Crim.P. 32(c)(1), because such a sequence enhances the perception that the judge is being impartial. *See, e.g., United States v. Doe,* 655 F.2d 920, 929 (9th Cir.1980) (remanding for new sentencing hearing on the basis of the appearance of fairness in a case challenging allocution procedures); *United States v. Malcolm,* 432 F.2d 809, 817 (2d Cir.1970) (defendant making guilty plea had right to present all relevant evidence bearing on his cooperation with the government, and the court had a duty to listen and give serious consideration to this evidence in imposing sentence). However, there is no basis to support the allegation here that the defendant did not have the opportunity to present information relevant to his objections at sentencing in this case, or that the district court failed to consider such information.

Wolfe's argument that the district court did not consider the reasons he presented for why he should receive the acceptance of responsibility reduction is even weaker. Wolfe offered no new evidence on this score at the sentencing hearing; he merely pointed to the recommendation by the probation officer in the PSR to grant an acceptance of responsibility adjustment, and to the evidence on which this recommendation was based. The district court's decision to deny the adjustment seems to have been primarily based on Wolfe's personal statement, in which he made a number of excuses for his criminal conduct.

Although Wolfe has some basis on which to argue that the district court erroneously found that 11 of the 460+ investors were first-time investors, rather than repeat investors, because it appeared from a stipulation by the government and the defense at the sentencing hearing that only 8 of these were first-time investors, this still leaves 3 inves-

tors that Wolfe characterized as rolling their money over in his "investment program," when in reality, these 3 were first-time investors. Thus, on this point Wolfe was still evading some responsibility. More importantly, the general tenor of all of the excuses found in Wolfe's personal statement was more than enough to support a determination by the district court that Wolfe had not accepted responsibility.

Wolfe desires a mechanical interpretation of the right of allocution, and allocution is not such a right. *See United States v. Twomey,* 806 F.2d 1136, 1143 (1st Cir.1986) (right of allocution not denied even where judge stated that he would not take defendant's word for anything, because statement should not be interpreted literally).

■ To show that his right to allocution has been denied, Wolfe points to the short two-day period of time between being informed that the district court was thinking about denying the acceptance of responsibility adjustment and the actual sentencing hearing. As a consequence, Wolfe requests an evidentiary hearing on the issue of acceptance of responsibility. He did not request such a hearing when he was before the district court.

The district court was under no obligation to inform Wolfe of its thoughts before the sentencing hearing. It did so merely as a courtesy. The district court's inclination to deny the acceptance of responsibility reduction was primarily based on Wolfe's personal statement, and no evidentiary hearing would have unwritten Wolfe's letter. The district court did not err in failing to grant Wolfe an evidentiary hearing on this issue, especially when Wolfe did not request such a hearing at the time. An evidentiary hearing would have been redundant under these circumstances, as Wolfe relies on evidence already discussed in the PSR to support his claim for an acceptance of responsibility adjustment.

### III. ACCEPTANCE OF RESPONSIBILITY

■ The "clear error" standard of review applies to the factual determination under the Sentencing Guidelines of whether a de-

fendant accepted responsibility. *United States v. Williams*, 940 F.2d 176, 181 (6th Cir.), *cert. denied*, 502 U.S. 1016, 112 S.Ct. 666, 116 L.Ed.2d 757 (1991). The burden is on the defendant to convince the reviewing court that the trial court erred in failing to rule that the defendant accepted responsibility. *United States v. Watkins*, 994 F.2d 1192, 1197 (6th Cir.1993).

■ The district court did not clearly err in finding that Wolfe had not, in fact, accepted responsibility for his crimes under USSG § 3E1.1.[1] Wolfe hedged in a number of respects: (1) he stated that many victims were angry because they misunderstood what he was trying to do; (2) he pointed a number of times to the happiness his "investment program" brought to earlier investors; and (3) he erroneously indicated that at least 3 first-time investors were in fact rolling their money over in the "investment program." Given the exculpatory nature of the personal statement that Wolfe made, the district court did not err, let alone clearly err, in concluding that Wolfe had not accepted full responsibility for his criminal acts. *See United States v. Wallace*, 16 F.3d 1223, 1994 WL 43460, at *1 (6th Cir.1994) (per curiam) (finding no clear error in district court's denial of an acceptance of responsibility adjustment because "acceptance of responsibility has to be an acceptance without excuses"). *Accord United States v. Jones*, 55 F.3d 289, 295 (7th Cir.) ("grudging and incomplete admission, accompanied by an excuse to minimize his own culpability, does not indicate acceptance of responsibility"), *cert. denied*, — U.S. —, 116 S.Ct. 161, 133 L.Ed.2d 104 (1995) (quoting *United States v. Aquilla*, 976 F.2d 1044, 1053 (7th Cir.1992)).

■ Wolfe's arguments for why the district court committed clear error are unavailing. The probation officer's recommendation that Wolfe receive the adjustment is relevant, but not dispositive. The district judge, not the probation officer, is empowered to sentence a criminal. Here, there was sufficient evidence on which the district court could conclude that Wolfe did not fully accept

responsibility. Wolfe's attempt to avoid this conclusion, by reference to the eight criteria listed in Application Note 1 to 3E1.1, falters on the very first criteria—whether Wolfe truthfully admitted the conduct comprising the offense. Here, the district court properly found that Wolfe admitted to certain conduct, but constantly attempted to mischaracterize that conduct, "spin" it, so to speak, and minimize his responsibility. Under the "great deference" accorded the sentencing judge's determination that a defendant has or has not accepted responsibility, this court cannot hold that the district court's finding here was clear error. *United States v. Moored*, 997 F.2d 139, 145 (6th Cir.1993); USSG § 3E1.1 comment. (n.5).

■ Moreover, Wolfe also ignores commentary in 3E1.1 that is unfavorable. Application Note 3 states that "[e]ntry of a plea of guilty . . . combined with truthfully admitting the conduct comprising the offense . . . will constitute significant evidence of acceptance of responsibility. . . . However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." USSG § 3E1.1 comment. (n.3). A guilty plea does not automatically entitle Wolfe to this adjustment. *United States v. Carroll*, 893 F.2d 1502, 1512 (6th Cir.1990). Wolfe's personal statement was inconsistent with acceptance of responsibility, and outweighed his guilty plea and cooperative behavior.

## IV. AMOUNT OF LOSS

Wolfe does not challenge the facts on which the PSR and the district court calculated the amount of loss for sentencing purposes; he challenges the application of the Sentencing Guidelines to that set of facts. As such the standard of review is *de novo*. *United States v. Pierce*, 17 F.3d 146, 151 (6th Cir.1994); *United States v. Holiusa*, 13 F.3d 1043, 1045 (7th Cir.1994) ("meaning of 'loss' for purposes of section 2F1.1 is a question of law that is subject to de novo review").

---

1. USSG § 3E1.1 provides, "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level. . . ."

■ Wolfe submits the district court made two errors in calculating the amount of loss he inflicted on his investors. First, the gain to Wolfe and not the loss to victims should be the proper measure of amount of loss. Second, the proper measure of amount of loss should be the net loss that Wolfe will have inflicted if the bankruptcy trustee recovers 90–95% of the victims' losses from previous investors, as Wolfe claims the bankruptcy trustee will do. The first argument is frivolous. *Watkins,* 994 F.2d at 1195, makes clear that the Guidelines focus on loss "inflicted" on the victim, not gain to the defendant. The fact that Wolfe received only $360,000 in salary from his Ponzi scheme is irrelevant, because first-time investors in NLC have lost $4.2 million.

USSG § 2F1.1 sets up a table for enhancing the defendant's sentence based on the amount of loss inflicted. "Amount of loss" is not defined in USSG § 2F1.1 itself, but the commentary notes that the amount of loss should be calculated differently depending upon the kind of criminal activity involved. *See, e.g.,* USSG § 2F1.1 comment. (n.7) (differentiating between theft of property and crimes of fraud). Wolfe's crime is one of fraud, and so Application Note 7 gives some guidance.[2] Wolfe's fraud, however, does not fit precisely into any of the examples given in Application Note 7—for example, it is not a misrepresentation of the value of an item,

nor is it a fraudulent loan application, nor a fraudulent contract procurement. *See* USSG § 2F1.1 comment. (n.7).

■ Two elements of Application Note 7 might apply, however. First, Application Note 7 focuses on intent to the extent the intended loss is greater than the actual loss. Here, this element neither helps nor hurts Wolfe's argument for a reduction in the amount of loss. If Wolfe's statements that he never intended for anyone to lose money in his program are believed, and the district court did not specifically find that Wolfe lacked credibility on this point, then Wolfe intended lower total losses to investors than actually occurred. Hence, actual loss is the appropriate measure of this crime.

The question remains, however, how actual loss should be calculated, and this is where a second element of Application Note 7 becomes useful. The example included in Application Note 7 for fraudulent loan applications allows reductions in the amount of loss for the value of collateral if a loan is secured. *See United States v. Chichy,* 1 F.3d 1501, 1507–08 (6th Cir.) (addressing the estimation of losses caused by fraudulent loan applications to HUD), *cert. denied,* —— U.S. ——, 114 S.Ct. 620, 126 L.Ed.2d 584 (1993). Wolfe's second argument is essentially that he should be able to set off amounts that will be recovered by the bankruptcy trustee, just

---

**2.** Application Note 7 provides:

Valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). As in theft cases, loss is the value of the money, property, or services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred. Consistent with the provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss. Frequently, loss in a fraud case will be the same as in a theft case. For example, if the fraud consisted of selling or attempting to sell $40,-000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000.

There are, however, instances where additional factors are to be considered in determining the loss or intended loss:

(a) *Fraud Involving Misrepresentation of the Value of an Item or Product Substitution*

. . . .

(b) *Fraudulent Loan Application and Contract Procurement Cases*

In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if the defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used. . . .

(c) *Consequential Damages in Procurement Fraud and Product Substitution Cases*

. . . .

(d) *Diversion of Government Program Benefits*

. . . .

(e) *Davis–Bacon Act Cases*

. . . .

as a fraudulent loan applicant can set off the realizable value of collateral. Wolfe alleges that the bankruptcy trustee may be able to recover two categories of funds: (1) assets held by NLC and its subsidiaries, and (2) payouts to earlier investors as preferential transfers.

In *Holiusa*, the Seventh Circuit considered the application of Section 2F1.1 to a Ponzi scheme. The facts are strikingly similar to this case. Holiusa created an "investment program" in high-yield government securities and silver futures. A total of $11.6 million was invested in the entire operation, but $8.0 million was paid out to early investors. The question was whether Holiusa should be sentenced based on the full $11.6 million or the net loss of $3.6 million. Despite the specific finding by the district court judge that Holiusa intended to inflict a loss of the whole $11.6 million, the Seventh Circuit held that the net loss was the proper measure of the amount of loss, not the gross loss.[3] *Holiusa*, 13 F.3d at 1048. Here, the district court sentenced Wolfe on the basis of the net loss, $4.2 million, in accord with *Holiusa*, not the gross loss, which in Wolfe's case was $7.1 million. Thus, one challenge Wolfe might have made to his sentencing was defused by government's careful limitation of the amount of loss to the net loss, which the district court adopted.

Wolfe raises a different argument than the defendant in *Holiusa*, however. Wolfe claims that 90–95% of the losses experienced by first-time investors can be recovered by the bankruptcy trustee. The district court did not make any findings on this issue. The government did not address the issue in its brief, either. Thus, if we agree with Wolfe's claim, the amount of actual loss Wolfe will ultimately have inflicted on first-time investors falls to $420,000 at most.

▮ *United States v. Wilson*, 980 F.2d 259, 262 (4th Cir.1992), sheds light on the question of whether amounts returned by the bankruptcy trustee are properly includable in the amount of loss calculation. *Wilson* holds that the amount repaid to a bank by the

guarantor of a fraudulently-induced loan was nevertheless properly included in the amount of loss that the fraud inflicted. Wolfe's fraud is similar to this case. Unlike the case discussed in Application Note 7, indicating that setoff for collateralized losses is permissible, in a guaranty situation, the money to be returned to victims does not come about by the defendant's own agency. Wolfe cannot reduce the magnitude of his own crime by relying on the actions of the bankruptcy trustee, just as the defendant in *Wilson* could not rely on the actions of the guarantor. Other cases have reached similar results in different contexts, but the basic notion that the agency of another cannot be used to reduce the amount of loss is the same in each. *See, e.g., United States v. Rothberg*, 954 F.2d 217, 218–19 (4th Cir.1992) (amount recovered by civil restitution cannot be set off); *United States v. McAlpine*, 32 F.3d 484, 489 (10th Cir.) (tax savings to victim cannot be set off), *cert. denied*, —— U.S. ——, 115 S.Ct. 610, 130 L.Ed.2d 520 (1994); *United States v. Harris*, 38 F.3d 95, 99 (2d Cir.1994) (same), *cert. denied*, —— U.S. ——, 115 S.Ct. 1269, 131 L.Ed.2d 147 (1995).

The recent Sixth Circuit case of *United States v. Wright*, 60 F.3d 240 (6th Cir.1995), is also illuminating. *Wright* permits the setoff of benefits in the fraudulent loan context where the lender contractually has the right of setoff against the defendant's bank account. The difference between *Wright* and Wolfe's case is that the recovered funds in *Wright* stemmed directly from the defendant's actions, not the actions of others.

Perhaps the best case for illustrating the theory behind the amount of loss calculation under Section 2F1.1 is *United States v. Schneider*, 930 F.2d 555 (7th Cir.1991). *Schneider* disallowed use of the face value of fraudulently obtained government contracts for calculating the amount of loss. Writing for the Seventh Circuit, Judge Posner distinguished between outright theft, an act complete when the good is taken, and the situation where a contractor intends to perform a valuable service, but obtained that right to

---

3. Judge Manion dissented, largely because the district court had found that Holiusa intended to

inflict the full $11.6 million loss.

perform fraudulently. Here, Wolfe might argue that he is in a similar position to the contractors in *Schneider*. But *Schneider* is distinguishable in a number of ways. First, the contractors in *Schneider* could not have received any money for performance on the contract unless they had begun performance. For the first-time investors in this case, there is no evidence that Wolfe had located sufficient liquidation deals to give some real basis to his Ponzi scheme.

Second, Wolfe's scheme was not sustainable, whereas it was perfectly possible for the contractors in *Schneider* to have performed the contract to the government's satisfaction. A Ponzi scheme, by contrast, must eventually collapse. Third, there are significant proof and timing problems associated with the rule that Wolfe advocates, at least as to the recovery by the bankruptcy trustee of the alleged preferential transfers to earlier investors. At the time of the Schneiders' sentencing, evidence of the actual loss inflicted on the government was complete, whereas Wolfe is forced to speculate as to the amounts of money recoverable by the bankruptcy trustee. This opens up many questions: should the district court make a reasonable estimate of the amounts recoverable, or should the district court delay sentencing until after the bankruptcy trustee has completed his work? *Chichy* may indicate that reasonable estimation could be used to solve this hypothetical problem, in accordance with USSG § 2F1.1 comment. (n.8), but in *Chichy* the losses could be estimated with reasonable certainty because of available data about net recoveries in HUD foreclosure cases, whereas one estate's bankruptcy is more of an isolated event. These difficulties make Wolfe's proposed set-off rule unworkable.

The amounts recoverable by the bankruptcy trustee should not be allowed to reduce the amount of loss Wolfe inflicted because recovery of these monies depends on the agencies of another, because Wolfe's Ponzi scheme was insubstantial and unsustainable, because setoff of such monies would create a rule difficult to administer, and because the amounts that might be recovered by the bankruptcy trustee are wholly speculative.

## V

Neither Wolfe nor his counsel were denied their right to allocution. Wolfe's excuses in his personal statement justify the district court in denying him the adjustment for acceptance of responsibility. Amounts speculatively recoverable by the bankruptcy trustee cannot be set off against the amount of loss Wolfe's Ponzi's scheme inflicted on over 460 first-time investors. The district court's sentencing of Vance Wolfe in all respects is **AFFIRMED.**