107 F.3d 874
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appelle,
v.
Mario KIMBROUGH, Defendant-Appellant,
 No. 96-2816.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 28, 1997.
Decided Feb. 14, 1997.
 
 Before BAUER, KANNE and EVANS, Circuit Judges.
 
 ORDER
 
 1
 Mario Kimbrough pleaded guilty to one count of conspiracy to commit telecommunications fraud for selling cloned cellular phones. 18 U.S.C. § 1029(a)(5), (b)(2). On appeal, he challenges the district court's calculation of his sentence based on the loss caused by his fraud. Because his argument has no merit, we affirm his sentence.
 
 
 2
 Kimbrough ran a scheme that "cloned" cellular telephones--that is, he altered and sold cellular telephones that would falsely transmit the identifying data of legitimate cellular phone users to cellular telecommunications service providers. The cellular providers would thus bill the calls to the legitimate account holders, rather than the people using the cloned phone. (The scheme is essentially the same as selling forged credit cards--the buyer of the forged credit card can run up charges, and the bill gets sent to the legitimate owner of the card.)
 
 
 3
 Kimbrough cloned 26 cellular phones and sold them for a hundred dollars each. Because the fraud would be detected for each cloned phone within a month (when the legitimate cellular subscriber received his bill and hit the ceiling because he was charged for a batch of calls he did not make), each buyer of one of Kimbrough's cloned phones was paying $100 for one month of unlimited "free" cellular service. Kimbrough's 26 customers ran up $40,890.64 in charges for calls made on the cloned phones.
 
 
 4
 The Secret Service nailed Kimbrough, who ultimately pleaded guilty to one count of conspiracy to commit telecommunications fraud. 18 U.S.C. § 1029(a)(5), (b)(2). At his sentencing, the district court increased Kimbrough's offense level by 5 points, pursuant to U.S.S.G. § 2F1.1(b)(1)(F), because the loss to the cellular providers exceeded $40,000. This increase brought Kimbrough's total offense level to 11.[1] Based upon his substantial assistance to the government, the prosecution moved for--and the court granted--a 2-level downward departure, bringing Kimbrough's offense level to 9. Kimbrough had no criminal record, so the district court sentenced him to 3 years probation and ordered him to pay $40,890.64 in restitution to the cellular providers.
 
 
 5
 At his sentencing, Kimbrough objected to the 5-point increase in his offense level for the cellular providers' loss and to the $40,890.64 order of restitution. He did not deny that the purchasers of his cloned phones ran up that amount in fraudulent charges; rather, he argued that any losses the cellular providers suffered due to his purchasers' use of their phones were merely incidental to his fraud, and therefore not attributable to him. The district court overruled Kimbrough's objection, and he now raises the same argument on appeal.
 
 
 6
 The commentary to § 2F1.1 explains that "loss," for the purpose of increasing the offense level for fraud, "is the value of the ... property [ ] or services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred." U.S.S.G. § 2F1.1, comment. (n. 7) In United States v. Marlatt, 24 F.3d 1005, 1008 (7th Cir.1994), we held that for the purpose of determining the amount of loss under U.S.S.G. § 2F1.1, a district court should not consider incidental or consequential damages. The defendant in Marlatt sold condominiums and issued to each purchaser a title insurance policy that falsely indicated that the purchaser was obtaining clear title when in fact the titles were heavily encumbered. When the title insurance company discovered the fraud it spent $476,000 to clear the titles to the units. Meanwhile, however, the units had declined significantly in value. To avoid being sued by the purchasers, the title insurance company bought back the units at their original purchase price, for an additional $565,000. We held that the $565,000 in the title insurance company spent to protect itself from suit was a "consequential" or "incidental" loss not encompassed by § 2F1.1. Id.
 
 
 7
 Kimbrough argues that the $40,890.64 loss to the cellular providers is likewise an "incidental" or "consequential" loss for which he is not responsible. His rationale is that the only "property" or "service" he took from the cellular providers was the monthly activation fee (about $50) for each of the 26 phones he cloned; he claims that he should not be held responsible for any charges incurred by the purchasers of the cloned phones because the purchasers--rather than he--took those services from the cellular provider. (This argument is identical to that of a defendant who sells forged credit cards and then claims he is not liable for the charges incurred by the purchasers of the forged cards.)
 
 
 8
 Kimbrough's position is meritless. None of his buyers paid $100 to avoid a $50 activation fee; they paid $100 to receive a month of unlimited "free" (at least to them) cellular air time. Kimbrough's fraud was not merely that he cheated the cellular providers out of 26 monthly activation fees; instead, he sold unlimited stolen cellular services. It does not matter that most of the benefit of the fraud accrued to Kimbrough's customers for § 2F1.1 speaks in terms of "loss" to the victim rather than benefit to the defendant. United States v. Wolfe, 71 F.3d 611, 617 (6th Cir.1995).
 
 
 9
 Similarly, it does not matter that once he sold a cloned phone Kimbrough no longer had control over how much his customers accumulated in charges--the intervening acts of third parties do not relieve a defendant of liability for the loss caused by his fraud. In United States v. Morris, 80 F.3d 1151 (7th Cir.), cert. denied, 117 S.Ct. 181 (1996), the defendants were bank officers convicted of wire and mail fraud after they withheld material information concerning the bank's financial status in connection with a bond offering. The purchasers of the bonds lost their entire investment when the bank failed. The defendants objected to the increase in their offense levels for the lost value of the bonds, contending that their fraud did not actually cause the bank's failure, and hence was not the cause of the investors' losses. Id. at 1171. We rejected the defendants' argument, holding that "the existence of intervening causes does not provide a basis for reducing the amount of loss under § 2F1.1(b)(1)" where the defendants' fraud put the victims' investments at risk. Id. at 1173. See also United States v. Miller, 962 F.2d 739, 744 (7th Cir.1992). There is no question in this case that--despite the intervening acts of Kimbrough's customers in running up large phone bills--it was Kimbrough's fraud (by cloning cellular phones) that placed the cellular providers at risk of the loss they actually incurred. Thus, Kimbrough is responsible under § 2F1.1 for the $40,890.64 loss, and the district court's judgment is AFFIRMED.
 
 
 
 [1]
 The base offense level for fraud is 6. U.S.S.G. § 2F1.1(a). The district court increased Kimbrough's offense level by 5 points because his fraud caused between $40,000 and $70,000 in losses, U.S.S.G. § 2F1.1(b)(1)(F), and increased it another 2 points because the scheme involved more than minimal planning. U.S.S.G. § 2F1.1(b)(2)(A). The district court then decreased Kimbrough's offense level by 2 points for acceptance of responsibility, U.S.S.G. § 3E1.1(a), for a total offense level of 11