**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jerry Lee MCINTOSH, Defendant–
Appellant,**

**No. 01–5319.**

United States Court of Appeals,
Sixth Circuit.

Dec. 6, 2002.

Before KENNEDY and MOORE, Circuit Judges, and DOWD, Senior District Judge.*

## OPINION

DOWD, District Judge.

Defendant/Appellant (hereafter "defendant"), convicted of one count of bank fraud on his plea of guilty, challenges his sentence to a prison term of 30 months. The base offense level for bank fraud was set at six levels. In computation of the adjusted offense level, four levels were added, in compliance with U.S.S.G. § 2F1.1(b)(1)(F), based on a finding that the loss exceeded $20,000 but was not more than $40,000. An additional two levels were added for more than minimal planning as required by § 2F1.1(b)(2). As defendant's conduct in the bank fraud scheme included misrepresentation that defendant was acting on behalf of a charitable organization, i.e., The American Red Cross, an additional two levels were added as required by § 2F1.1(b)(4). Finally, two more levels were added to the offense level based on the finding that the offense involved sophisticated means as addressed in § 2F1.1(b)(6), for a total of 16 levels less a reduction of three levels for a timely acceptance of responsibility pursuant to § 3E1.1(a). The resulting adjusted offense level was 13.

Defendant was charged with nine criminal history points for a Criminal History of IV. As a consequence, the sentencing range was 24 to 30 months. Thus, the sentence of 30 months was lawful, assuming the court correctly calculated the offense level and the criminal history category.

* The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

Defendant first challenges the calculation of the offense level by disputing the amount of the loss. He next challenges the finding that the offense involved sophisticated means.

■ This court reviews the district court's determination of the amount of the loss for clear error. *United States v. Abdullah,* 162 F.3d 897, 906 (6th Cir.1998). Defendant produced counterfeit checks, each in the amount of $6,500, and convinced four persons to negotiate the checks at local banks. Each was successful, so that the total initial loss was $26,000. At sentencing, defendant admitted that he intended to obtain $6,000 from each check for a total of $24,000. He objected to the four additional levels because there was some testimony that the actual net loss was under $20,000. A judicial finding as to actual net loss is not required. Rather, the issue is the intended loss. Application Note 8 to U.S.S.G. § 2F1.1 provides that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." Defendant's argument at sentencing that he did not intend to inflict a loss of over $20,000 is without merit. The district court properly calculated the loss.

■ Defendant's claim that he did not use sophisticated means is also totally without merit. The description of defendant's conduct was set forth during the guilty plea proceedings in the required showing of a factual basis. Robert Jones, the investigating officer, testified and offered this relevant testimony:

That investigation revealed the following facts which the United States would expect to prove at a trial in this case.

This case originated on September 24, 1999, when Officer Belew of the Metropolitan Nashville Police Department telephoned the Nashville field office of the Secret Service.

He had responded to First American Bank when a branch service assistant reported a suspect attempting to pass a counterfeit commercial check.

Upon his arrival, Officer Belew said he detained the suspect, Will Brown, for questioning. He called and requested my assistance with this investigation.

That same day I responded to First American Bank and interviewed Officer Belew. He said the suspect had provided him with the following information.

Brown said he responded—Brown is the subject that was being detained—said he responded to a local help-wanted advertisement in *The Tennessean* on September 20, 1999.

Brown said that he met a man identifying himself as Skip Reed at the Drury Inn, in Nashville, Tennessee. The investigation later determined that Skip Reed is an alias for Jerry Lee McIntosh.

He said Reed held interviews for applicants in the front lobby of the hotel. Brown said Reed hired him as an area field representative for a company that would place photographs of used automobiles on the internet. Reed told Brown that he would be in touch with him about the job.

He said Reed called a couple of days later and asked him to meet him at the Drury Inn on Friday, September 24th, at 10:00 a.m.

Brown said Reed gave him a check at this meeting from Tom Bannen Chevrolet for $6,800 drawn on First American National Bank, here in Nashville, Tennessee. He said Reed told him that this dealership had hired Reed's company to conduct some computer work and that Brown would be conducting the work for Tom Bannen.

Brown said he was told by Reed to go to the bank and cash the check. Brown said Reed told him he'd receive a $500

advance; $3,800 would be for him to purchase a computer and $2,500 would be for advertisements. Brown said Reed told him he would call him Friday evening on September 24, 1999.

He said he tried to cash the check at a First American branch when he was detained and told the check was counterfeit.

Officer Belew said Jim Grant, the general manager of Tom Bannen Chevrolet, came to the bank and verified, in fact, the check was counterfeit.

On September 25, 1999, the investigation determined that there would be a meeting at Denny's restaurant between Reed and another individual suspected of passing a counterfeit check.

I showed up at this meeting at Denny's and recognized the two individuals matching the descriptions of the suspects.

After a few minutes, I requested Metropolitan police officers to come into the restaurant and assist me in interviewing the two suspects.

Since the restaurant was busy, we took the suspects outside and interviewed them outside.

Before I had a chance to say anything to Reed, he told Officer Woodside, of the Metro Police Department, "I'm glad you caught me." I read both Reed and the other suspect who identified himself as Jerry Linville, their rights, and both said they wanted to make statements.

Reed signed a waiver of his rights after identifying himself as Jerry Lee McIntosh. Jerry Linville identified himself as Jerry Linville. Identification found on both verified their identities.

In the presence of the two police officers assisting me, McIntosh admitted to manufacturing the counterfeit checks and giving them to Linville and others who were unknowingly part of his fraud-ulent counterfeit commercial check scheme.

He said he printed the counterfeit checks at the Crestwood Suites, Suite Number 116, 1345 Old Fort Parkway, Murfreesboro, Tennessee.

McIntosh said some of the case and some of the computer equipment obtained from the fraudulent scheme were in a white Geo Metro LSI he had been driving, which was parked in the Denny's parking lot.

. . . .

I interviewed him that same day. He said his true identity was Jerry Lee McIntosh. He said the name Skip Reed was a fictitious name. He admitted to knowingly manufacturing and distributing counterfeit checks with the intent to defraud.

He said he was residing at the Crestwood Suites, Murfreesboro, Tennessee, and had manufactured the counterfeit checks in this room.

He said he placed a help-wanted advertisement in the classified section of *The Tennessean* on September 18th and 19th for area field representatives.

He said this was not a legitimate job offer. He said he returned calls from responses he had received from the ad and set up appointments on the 20th and 21st of September.

McIntosh said he held interviews at the Drury Inn on Harding Place in Nashville.

He said on September 21st, he called several people and told them they had received the job. He said he hired four passers and two backup passers.

He said those passers were Lynda Gail Grisham, Stephanie Leiendecker, Jerry Linville, George Austin, Will Brown and Robert Cotter.

He said no one questioned his scheme, and he did not advise the passers the checks were counterfeit.

McIntosh said he passed out the checks on Thursday and Friday so the passers could pass the checks by Friday at 2:00 p.m. He told the passers he'd meet them on Saturday to go over the business and get the money from the counterfeit checks.

McIntosh said he was planning to leave after he had received the money from the passers.

(J.A., Vol. I at 162–165, 166–167).

We find no error in the district court's determination that defendant employed sophisticated means in committing the bank fraud.

Defendant contends that he was overcharged two points because the assessment of three points for the bank fraud conviction in the Northern District of Georgia as set forth in paragraph 53 of the Presentence Report was related to the conviction for bank fraud in the Western District of North Carolina as described in paragraph 54 for which he was assessed two points. We disagree.

McIntosh now claims that the 1991 amendment to the Sentencing Guidelines which precluded related convictions being counted as a single conviction if there was an intervening arrest is inapplicable because the prior convictions were for related crimes committed prior to the amendment. *See* U.S.S.G. § 4A1.2, application note # 3 for the commentary on an "inter-

vening arrest" as applied to related cases. The prior convictions for bank fraud were in separate states and separated by an "intervening arrest" as indicated in paragraph 54 of the Presentence Report. No objection was taken by defendant to the criminal history calculation until the appeal. We need not pause to consider whether the North Carolina and Georgia convictions were "related" so as to count as only one conviction because, in any event, the number of criminal history points that would accrue is at least three. Even if the subsequent bank fraud conviction is not counted, the defendant would have remained in Criminal History Category IV.[1]

■ Defendant's denial of a downward departure is not appealable. After listening to the testimony offered in support of the downward departure motion, the district court declined, stating that "a departure is not authorized under facts of this case."

The defendant also contends that the district court erred in denying him his right of allocution. Although defendant's sentencing came at the end of a protracted sentencing hearing during which defendant *testified* at great length in support of his objections to the Presentence Report, the district court did not actually give defendant the opportunity to exercise his right of allocution, i.e., to express his thoughts in an *unsworn statement*.[2] Such failure constitutes error. The error, however, was not brought to the district

---

1. Secion 4A1.2 (a)(2) in the Sentencing Guidelines Manual, effective as of the date of defendant's crimes committed in South Carolina and Georgia, provided:

   (2) Prior sentences imposed in unrelated cases are to be counted separately. Prior sentences imposed in related cases are to be treated as one sentence for purposes of the criminal history. Use the longest sentence of imprisonment if concurrent sentences were imposed and the aggregate sentence

of imprisonment imposed in the case of consecutive sentences.

2. At the time of the January 12, 2002 sentencing hearing, Fed.R.Crim.P. 32(c)(3)(C) provided that the court must "address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence."

court's attention. Rather, after the sentence was pronounced, defendant merely made two requests concerning the location of his incarceration and a condition of his supervised release. *See* J.A. at 332–33.

In 1952, the Federal Rules of Criminal Procedure first provided for the right of allocution.[3] Rule 32(a) stated in pertinent part that "[b]efore imposing sentence, the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of sentence."

In *Green v. United States*, 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961), the Supreme Court considered compliance with Rule 32(a) as it reviewed a sentence pronounced by the District Court of Massachusetts in 1952. Before sentencing the defendant for bank robbery and related charges, the sentencing judge asked: "Did you want to say something," without the record indicating to whom (the defendant or his counsel) the question was directed. The defendant's counsel spoke at length; but the record failed to indicate any response by the defendant. Against that background, many years later, the defendant filed an action under Fed.R.Crim.P. 35 to set aside the sentence because the Rule 32(a) right of allocution had been denied. A sharply divided Supreme Court denied relief; but the majority opinion written by Justice Frankfurter admonished district court judges to clearly address the defendant and extend the opportunity for allocution before pronouncing sentence. *Id.* at 305, 81 S.Ct. 653.

Our circuit has repeatedly revisited allocution issues. In *United States v. Thomas*, 875 F.2d 559, 561 (6th Cir.1989), the court held that the district court sufficiently satisfied the mandate of Rule 32 by addressing each defendant and his counsel

and by stating to the defendant, "This is the time set for your sentencing. Either you or [defense counsel] can do it in your behalf." However, emphasizing that *Green v. United States, supra*, had directed strict compliance with Rule 32 to protect the defendant's personal right to allocution, the court restated the Supreme Court's admonition in the following mandate:

> [T]o avoid litigation arising out of ambiguous records in order to determine whether the trial judge did address himself to the defendant personally, we think that the problem should be taken out of the realm of controversy. This is easily accomplished. Trial judges before sentencing should, as a matter of good judicial administration, unambiguously address themselves to the defendant. *Hereafter trial judges should leave no room for doubt that the defendant has been issued a personal invitation to speak prior to sentencing.*

*United States v. Thomas*, 875 F.2d at 561 (quoting *Green v. United States, supra* ) (emphasis added).

Obviously, the sentences reviewed by the *Thomas* court predated the November 1987 effective date of the Sentencing Guidelines, which ushered in an entirely new phase with respect to the sentencing hearing in a federal criminal case. For post-November 1987 defendants, the sentencing hearing frequently addressed objections to the calculations of the offense level and/or the criminal history category. The issue of departures, either upward or downward, sometimes also entered into the sentencing hearing.

Our circuit has addressed the tension between resolution of sentencing disputes and timing for the exercise of the right of allocution. In *United States v. Wolfe*, 71 F.3d 611 (6th Cir.1995), the defendant

---

**3.** The right of allocution prior to sentencing is deeply rooted in English common law, as amply chronicled in an article in the Missouri Law Review. *See,* Paul W. Barrett, *Allocution,* IX Mo. L.Rev. 115 (1944).

complained that his right of allocution was denied because his counsel was not given the opportunity to speak until after the district court indicated how it intended to rule on the defense's two objections to the Presentence Report. However, after the district court made the necessary decisions prompted by the objections to the Presentence Report, the defendant declined the offered opportunity to speak for himself. In responding to the new tension created by the Sentencing Guidelines, the *Wolfe* court rejected the argument that a defendant's right of allocution had to precede the district court's rulings on the defendant's objections to the Presentence Report.

In *United States v. Riascos–Suarez,* 73 F.3d 616 (6th Cir.1996), failure to grant the defendant the right to allocute resulted in vacation of the sentence and remand for re-sentencing. After describing as reversible error the trial court's failure to follow the mandate of Rule 32, the *Riascos–Suarez* court declared:

> Riascos–Suarez claims that the court erred when it failed to address him personally prior to imposing a sentence as required by Federal Rules of Criminal Procedure Rule 32(c)(3)(C). Rule 32(c)(3)(C) states that before imposing sentence, a court must "address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence." A trial court's failure to follow Rule 32's mandate constitutes reversible error.

As the Supreme Court has recognized, Rule 32(c)(3)(C) grew out of the well-entrenched common law right of allocution. *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961). Allocution, a defendant's right to speak in his or her behalf before pronouncement of sentence, is not an empty formality. A defendant has the right to address the sentencing court

and demonstrate why he or she deserves a lesser penalty than the court would otherwise be inclined to impose. As one court noted, allocution "is designed to temper punishment with mercy in appropriate cases, and to ensure that sentencing reflects individualized circumstances." *De Alba Pagan,* 33 F.3d at 129.

> ... It is insufficient to give defense counsel, rather than the defendant, an opportunity to speak because "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Green,* 365 U.S. at 304, 81 S.Ct. at 655.

> ... In light of the court's failure to address the defendant, we find that Riascos–Suarez's [sic] was denied his Rule 32 right of allocution.

> We must therefore fashion an appropriate remedy.... Riascos–Suarez did not receive the "shortest sentence allowed by statute." ...

> Riascos–Suarez's allocution could have had an effect on his sentence. Therefore, his sentence must be vacated and the case remanded for a new sentencing hearing.

*Riascos–Suarez,* 73 F.3d at 627 (some internal citations omitted).

Against the background of *Green, Thomas, Wolfe* and *Riascos–Suarez,* we turn to the issue of remedy in this case. The *Riascos–Suarez* court, by reference to cases outside the Sixth Circuit, implied that the concept of "reversible error" would turn on the specific circumstances of the case under review. It compared Riascos–Suarez's sentence to those in *United States v. Lewis,* 10 F.3d 1086, 1092 (4th Cir.1993) and *United States v. Mejia,* 953 F.2d 461, 468 (9th Cir.1991), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1983, 118 L.Ed.2d 581 (1992). In those cases, the denial of the right of allocution where the defendant

was given the lowest possible sentence based on the Sentencing Guidelines calculations was not considered reversible error.

In the instant case, the appellee filed a motion to dismiss because the sentence of 30 months had been served. The motion was denied by a panel of this court on a finding that the term of supervised release of five years imposed by the district court could be reduced to the minimum term of three years.[4]

Here, the issue that remains is whether the imposition of the maximum term of five years for supervised release, under the specific circumstances of this case, constitutes reversible error requiring a remand for re-sentencing.

Immediately after the district court announced the sentence of 30 months with five years of supervised release, he made the following statement demonstrating his puzzlement over defendant's continued fraudulent conduct:

The reasons for my sentence are that Mr. McIntosh has got a—I'm sorry—Mr. McIntosh has committed frauds of this sort or fraudulent conduct—has engaged in fraudulent conduct on several other occasions and sometimes when he has been on supervision from a prior offense.

And he is a smart man, and he is a pleasant man. And, therefore, he's a dangerous man because I think it is very easy for him to hoodwink people because he's intelligent, he's articulate, he is at-

tractive looking, he has an engaging smile. And I think that's why he has been able to get away with some of these things that he has done.

The Court finds this particular fraud to be very sophisticated and—and very dangerous to society. And so that is why I'm sentencing Mr. McIntosh to the top of the guideline level.

I hope that a period of incarceration of this length will have an effect on him and that he will resolve to lead a different kind of life.

This is a man with two years of college, married for a long time, four grown children, siblings, a teacher, a computer analyst, a minister. I just find it rather remarkable, Mr. McIntosh, that with your background and your skills and your what could be a support mechanism—maybe they are not anymore for you—but with all of this kind of support of family surrounding you, that you can't get yourself on the straight and narrow and do something legitimate.

And so maybe with this much time in prison you can realize that this is not where you want to be the rest of your life, and you can resolve to turn your life around.

(Tr., Doc. No. 118 at 151–53).

■ After pronouncement of the sentence and before the sentencing hearing concluded, the only statement made by defendant was his request for the additional supervised release condition regarding subsequent business ventures.[5] No oppor-

---

**4.** Defendant has been in custody since his arrest on September 27, 1999. He entered the plea of guilty on May 25, 2000. The sentencing hearing took place on January 3, 2001.

**5.** The following colloquy took place:
THE DEFENDANT: Your Honor, I want to apologize for what has been happening. I have got to do something to make sure I

don't get in this position again. Can you, please, put something in the supervised release that would require me to have in any business venture written authorization to take any actions?
THE COURT: Written authorization to what?
THE DEFENDANT: Written authorization for whatever actions I have to take. And to give an example, one of the things that we had with Mr. Sigari was there was a dis-

tunity was offered for allocution. We must consider whether that failure constitutes reversible error under the specific circumstances of this case.

First, we note that the sentence of 30 months has been served. Second, defendant obviously welcomed the court's supervision by his unusual request that he obtain the permission of the district court before he entered into any new business venture. Finally, we observe that 18 U.S.C. § 3583(e) grants to the district court the power to terminate a period of supervised release as soon as one year after it has begun if the court is satisfied that such an early termination is warranted by the conduct of the released defendant and by the interest of justice.

The failure to grant defendant an opportunity to engage in allocution took place at the end of a lengthy sentencing hearing that did not conclude until 6:30 p.m. and during which the defendant had testified at great length in support of his objections to the Presentence Report. Under the circumstances of this case, i.e., with defendant's extensive comments, the lack of any objection, and the absence of any sugges-

tion as to what defendant would have said in an unsworn statement, we find no reversible error with respect to the length of the period of supervised release.

Based on the foregoing analysis, the sentence to a term of 30 months with a term of five years of supervised release is AFIRMED.

CORNELIA G. KENNEDY, Circuit Judge, concurring.

KENNEDY, Circuit Judge.

I concur in the affirmance of the supervised release sentence. I write separately because I believe defendant's appeal of the custodial part of his sentence, all of which is served, is moot. *United States v. Johnson*, 529 U.S. 53, 120 S.Ct. 1114, 146 L.Ed.2d 39 (2000) (where term of imprisonment should have ended earlier than it did, term of supervised release nonetheless commences on the date prisoner is released from imprisonment). Thus, while I do not disagree with the panel's holding that there was no error in the computation of the custody sentence, there was no rem-

pute about whether or not I was authorized to put money in my account. If I don't have that written authorization, I want the Court to say you can't do it.

In other words, to be able to do it, I have got to have written authorization because that's what's gotten me in trouble in this entire situation.

THE COURT: Okay. I'll make another—an additional condition of his supervised release that for any—for any authorization that Mr. McIntosh claims he has to act on the part of any other individual, he must provide to the probation office a notarized statement from that individual authorizing him to act for them.

THE DEFENDANT: Which is—

THE COURT: Does that do it?

THE DEFENDANT: That—I have got to get in the habit of doing that.

THE COURT: Okay. Is there anything else you would like me to add?

(Defendant confers with counsel.)

THE DEFENDANT: Your Honor, I hate to ask this, I know the medical situation—is there any way the Court will approve me to self-report to Atlanta? Okay. I don't want to—I want—in fact, I want to get out of the county jail situation. Can they be, please, asked to try to process me as soon as possible?

I have to try to make my conditions to where I won't—I won't have a problem.

THE COURT: Well, I'm sure the Bureau of Prisons will designate you as quickly as they can. I wouldn't think that would be a problem.

(Tr., Doc. No. 118 at 156–58).

edy we could afford defendant with respect to his term of imprisonment.