RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0113p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

          v.

FREEMAN CARL REED,

        *Defendant-Appellant.*

No. 14-2071

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:13-cr-00130—Janet T. Neff, District Judge.

Decided and Filed:  June 5, 2015

Before:  SUTTON, GRIFFIN, and WHITE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Barry A. Spevack, MONICO & SPEVACK, Chicago, Illinois, for Appellant.  Clay Stiffler, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge.  Freeman "Buck" Reed pled guilty to conning investors out of $1.3 million with false promises of buried treasure and received a seven-year sentence for the fraud.  On appeal, Reed claims that federal prosecutors made a false promise of their own by failing to recommend a three-year sentence in exchange for Reed's guilty plea.  Because the government eventually made this recommendation and because the government otherwise lived up to its end of the plea bargain, we affirm.

1

Buck Reed was a self-employed "Multi-Level Marketing" guru who sold an "antioxidant rich whole food puree" called "ViaViente." R. 113 ¶ 20; R. 109 at 2. He sold fruit juice, in other words, and on top of that he offered training sessions to teach other marketers how to replicate his success. To recruit trainees, Reed advertised himself as a self-made millionaire with large houses, luxury cars, boats, and extended vacations—all of which he financed with precarious levels of credit.

Reed's relationship with ViaViente did not pan out, and he and its producer each went their separate ways. Desperate for money and eager to preserve the lifestyle to which he had become accustomed, Reed came up with a new idea. He told several potential investors that he had access to a secret dig site in the Philippines containing gold bars buried by the Japanese military during World War II. He promised the investors a share of the gold if they would front him the money to pay for equipment, workers' salaries, and other extraction-related expenses.

Marketing guru that he was, Reed successfully raised more than $1.3 million real dollars to dig up the purported riches. Gold excavator that he was not, he never found any gold and indeed never tried. Rather than buying excavation equipment or shovels with the $1.3 million, Reed spent almost all of the money on two mortgages, five car payments, cosmetic surgery, and a riverfront deck for his home. The only money Reed spent on the search for El Dorado was a $30,000 purchase of a gold "scanner." R. 127 at 25. One can be forgiven for wondering whether he used the scanner on potential investors.

Before long, Reed's deception was exposed. He pled guilty to wire fraud in connection with a $250,000 investment that he used to better his home and garden. In exchange for the plea, the United States Attorney's Office agreed to make a nonbinding recommendation that Reed receive a three-year sentence for the fraud. The government also agreed not to oppose Reed's request to receive credit for accepting responsibility.

In its sentencing memorandum and at the sentencing hearing, the government stated that Reed should receive credit for accepting responsibility, *see* U.S.S.G. § 3E1.1, but it did not say anything about an appropriate sentence for the fraud. The government spent most of its time objecting to Reed's motion for a continuance. Reed wanted to postpone sentencing for ninety days to permit a new, movie-related venture to play out and, in the fullness of time, to permit

him to repay his victims.    The government responded by reciting Reed's pattern of broken promises and the outlandishness of his crime.

At the end of the hearing, the district court acknowledged the written terms of the plea agreement—that the "government has agreed pursuant to the plea agreement to recommend a three-year term of custody." R. 127 at 62.  Before the court could pronounce its sentence, Reed objected that the prosecutor had "never once recommended the three-year sentence. . . . It's not in his brief.  It's not in his [oral response] today." *Id.* at 63–64.  At that point, the government responded that it "recommended a three-year sentence." *Id.* at 64.  Reed protested that the recommendation had come too late.

The court rejected Reed's argument.    It considered the prosecutor's integrity "unimpeachable," and "[t]he fact that he may not have said it during these proceedings is not relevant.  He made the recommendation in the plea agreement." *Id.* at 65.  In weighing the various sentencing factors under 18 U.S.C. § 3553, the court also ruled that Reed should not receive credit for accepting responsibility because he "continue[d] to represent to anybody who [would] listen . . . that he continue[d] to believe in the validity of [his] totally incredulous schemes." *Id.* at 18.  The court sentenced Reed to over seven years.  On appeal, Reed reiterates his objection to the prosecutor's recommendation and challenges the court's acceptance-of-responsibility ruling.

*The prosecutor's recommendation.*  "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor" to recommend a particular sentence, "such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971).  Although the government need not make its recommendation "enthusiastically" or even explain its underlying reasoning, "it must carry out its part of the bargain by making the promised recommendation." *United States v. Benchimol*, 471 U.S. 453, 456 (1985) (per curiam); *see* Fed. R. Crim. P. 11(c)(1)(B).  A promise to recommend a particular sentence is not the same as making the recommendation. *United States v. Barnes*, 278 F.3d 644, 648 (6th Cir. 2002).

Although the government should have issued this recommendation on its own initiative, it did not breach the plea agreement by requesting a three-year sentence after Reed's formal objection but before the district court reached a conclusion.  As the plea agreement required, the

prosecutor told the court before it imposed a sentence that he "recommended a three-year sentence" and that he was "standing by [his] recommendation." R. 127 at 64. Even before Reed objected, the district court was well aware that the "government has agreed pursuant to the plea agreement to recommend a three-year term of custody." *Id.* at 62. Any tardiness by the government on this score did not compromise the fairness of the plea bargaining process.

This might be a different story if the government had failed to make any recommendation outside the plea agreement itself. As we have said, "the fact that the district court may have read and had the plea agreement before it [is an] insufficient reason[] to find that the government upheld its part of a given plea agreement." *Barnes*, 278 F.3d at 648. Although the government stresses the "non-binding" nature of its agreed-upon recommendation, *see* Appellee Br. 1, 8, 22, it was nonbinding on the *court*, not the prosecution. The prosecutor was obligated to fulfill his promise—which he eventually did.

Reed objects that the government was not only silent initially, but it also undermined its recommendation by telling the court how untrustworthy Reed was and how many people he had injured. But the government's statements about Reed's broken promises merely responded to Reed's request for a continuance. The government never advocated for a sentence over three years.

*The acceptance-of-responsibility reduction.* The district court also permissibly ruled that Reed did not accept responsibility for his crime. To receive the guidelines reduction, Reed had to "clearly demonstrate[]" his acceptance of responsibility—a demonstration inconsistent with "falsely den[ying], or frivolously contest[ing], relevant conduct that the court determines to be true." U.S.S.G. § 3E1.1(a) & cmt. 1(A). The court could also find the reduction unwarranted if Reed "attempted to minimize" his role in an offense after conviction. *United States v. Chalkias*, 971 F.2d 1206, 1216 (6th Cir. 1992). The trial court's determination receives "great deference" because the district court "is in a unique position to evaluate a defendant's acceptance of responsibility." U.S.S.G § 3E1.1 cmt. 5; *see United States v. Walker*, 182 F.3d 485, 487 (6th Cir. 1999).

Even after pleading guilty to wire fraud, Reed continued to argue he should receive leniency given his genuine belief that "there's gold in those hills." R. 127 at 4. The court

considered this belief "incredulous," *id.* at 5, and inconsistent with a defendant who had accepted responsibility for concocting a $1.3 million fraud, *id.* at 18.  Denying Reed the acceptance-of-responsibility credit on that basis was not error.  Nor does it matter that the government agreed with Reed that he should receive credit for admitting his involvement in the fraud.  The prosecutor's recommendation "is relevant, but not dispositive.  The district judge . . . is [the person] empowered to sentence a criminal." *United States v. Wolfe*, 71 F.3d 611, 616 (6th Cir. 1995).

For these reasons, we affirm.